**6**

Richard WILLIAMS, Libellant,

v.

THE S.S. RICHARD DE LARRINAGA, her boats, tackle, etc., in rem and Larrinaga Steamship Company, Ltd., as owners, agents, etc., in personam, Respondents.

No. 7932.

United States District Court
E. D. Virginia,
Norfolk Division.

Jan. 18, 1960.

Sidney H. Kelsey, Norfolk, Va., for libellant.

Seawell, McCoy, Winston & Dalton, Harry E. McCoy and Charles R. Dalton, Jr., Norfolk, Va., for respondents.

WALTER E. HOFFMAN, District Judge.

Libellant, a longshoreman, was injured on January 23, 1958, while aboard the S.S. Richard de Larrinaga in the performance of his duties, while endeavoring to raise an iron hatch cover at the No. 4 hold. The hatch is covered by three sections of iron, each held in place by four wheels fore and aft; two wheels being on each of the starboard and port sides of the hatch. This type of hatch cover is generally referred to as a MacGregor hatch cover, and the wheels, levers and pins are similarly denominated.

The hatch cover, when closed, is tight and rests upon the four wheels as indicated. In turn, the wheels or rollers rest in a somewhat detached position when the hatch cover is tight. To open the cover it is necessary to remove the MacGregor pin, place a MacGregor lever into a slot or socket designed for that purpose, and then push the lever clockwise in a semi-circle until it has raised the hatch a matter of inches. Then, by inserting the pin and thereby locking the wheel into position, the lever is removed and the hatch cover is free with the wheel raised up on its pivot. In this particular hatch raising device the greatest pressure exists when the lever or bar is at a vertical station. Once the cover is free with all four wheels raised on the pivots, the winches and rigging on the vessel are used to lift the cover and place it perpendicular to the hatch when fully open.

The accident occurred at the forward starboard wheel of the after section of the No. 4 hatch when libellant, in an effort to raise this particular wheel on its pivot, contends that the hatch cover fell

after the wheel had reached its pivot point and before libellant could remove the lever or bar. He states that he never had the opportunity of inserting the pin to lock the wheel into position. His contention is that the wheel was a "little stiff" in moving, but otherwise he was not personally aware of the cause of the fall of the hatch cover. When the hatch cover dropped, the lever or bar became loose and struck libellant on the right side of his head, inflicting rather serious injuries requiring an operation in connection with his right zygoma and, according to one qualified internist, he is suffering from a post-concussion syndrome.

We do not reach any consideration of damages. The testimony adduced by libellant is so hopelessly discredited that the case must fail. We are urged to accept the argument that the wheel or axle was bent and that this fact caused the hatch cover to fall. While all witnesses concede that the accident occurred at the No. 4 hatch, the preponderance of the evidence suggests that a demonstration conducted within a day or two following the accident was at the No. 3 hatch, or at least at some hatch forward of the pilot house. As the vessel has five holds, three forward and two aft of the pilot house, it is obvious that the demonstration and evidence relate to the wrong hatch cover.

Examining the evidence in this light we find that Alston (an I.L.A. officer), Benson (business agent of I.L.A. Local), proctor for libellant, and several longshoremen were present on the occasion of the test in question. At the trial, Alston and Benson did not testify as they were in attendance at a Union meeting in New York. As Benson was duly served, and elected not to appear, permission to take his testimony at a later date was refused. Alston was apparently not in the district when the subpoena was issued and, by leave of court, permission was granted to take his testimony at a later date. When Alston finally testified, he stated positively that the demonstrations were all conducted on hatches forward the pilot house. On the No. 3 hatch, he expressed the view that the axle was bent but, despite efforts made to correct his testimony, Alston steadfastly insisted that the bent axle he observed was on the hatch cover forward the amidships section. Stone, a longshoreman, stated that he witnessed the accident and, according to his version, the axle was bent between the hatch cover and the wheel. When recalled for further examination, he conceded that he could not see the axle itself due to the small space between the cover and the wheel, but arrived at his conclusion because the wheel appeared to bend out from the top. All parties admit that no wheel was removed during any test or demonstration. Stone's evidence is hopelessly discredited when we note that, at the time of his discovery deposition, he stated that he "couldn't determine anything about the wheel when he looked at it". Furthermore, at the trial Stone testified that he heard the wheel "trip" when libellant pushed the lever or bar to its semi-circle position, whereas, on discovery, he said that he heard no "tripping" or any other like noise.

Rudd, the gang leader, concedes that the accident took place at the No. 4 hatch, but further stated that he was the individual who conducted the demonstration at the No. 3 hatch in the presence of Alston, Benson and others. He testified that he had no recollection of any test or demonstration at the No. 4 hatch. While this witness did state that the "axle appeared to be bent on the No. 4 hatch wheel", he did not amplify his testimony on this point and it is too vague and slim to be persuasive in the light of all the other evidence.

One other longshoreman, Yates, said that the axle was bent after the accident, and that Rudd performed a test at the No. 4 and No. 2 hatches; all of which is in direct conflict with other evidence introduced by libellant.

When we consider the flimsy quality of this evidence and contrast the same with the testimony adduced by respondent, we reach, without difficulty, the conclusion that the cause of this accident

was very probably as described by respondent's expert, Woodward, a naval architect of considerable experience. We need not arrive at a determination of the proper method used in pushing the bar or lever, and whether good practice required the insertion of the pin prior to the removal of the bar from the slot or socket of the wheel. As the bar adjusts to the hole where the safety pin must be inserted, it is unlikely that good practice calls for the removal of the lever prior to inserting the pin. The expert stated that, while the probabilities of a bent axle are very remote as a twenty ton load would be required to bend same, if the axle was bent in such a manner as to contribute to the falling of the hatch cover, the operator would feel it at all times as the pressure would remain on. In short, the expert attributes the falling of the hatch cover to a "state of unstable equilibrium", which he describes as the slightest external force which will throw the wheel off balance. He further stated that the axle cannot be seen other than on the extreme outside of the wheel which, of course, is the very end of the axle.

While the master of the vessel admitted that "a man with a brief case", presumably Alston, had advised him that a man had been injured, he denies any knowledge of the details. When the vessel left Norfolk following the accident, she proceeded to Rotterdam where she unloaded. From this point the vessel went to London; thence to Albany, New York, where she loaded; thence to Liverpool at which point she discharged cargo; thence to Quebec for loading and on to London and Hull for unloading. She sailed for Port Arthur, Texas, and after arrival the master was advised, on May 25, 1958, that an action had been filed in this court. As the No. 4 hold is next to the largest hold on the vessel, it is always in use when carrying cargo. The MacGregor hatch cover had been used in the interim period without any repairs being conducted. On May 26 the hatch wheel in controversy was tested, taken apart, and examined. No defects were disclosed. These facts were corroborated by Rennie, a senior surveyor for Lloyd's Register of Shipping, who also boarded the vessel at Port Arthur on May 26, 1958.

As libellant testified that the accepted practice among longshoremen was to remove the bar before inserting the safety pin, the conclusion of this Court is that the sole cause of the accident was some external force applied by libellant which disturbed the equilibrium of the wheel. There is, therefore, no evidence of unseaworthiness or negligence. It is one of the hazards of the business of a longshoreman which may be compensated for under humanitarian legislation such as the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq., but which forms no basis for any recovery against the vessel or its owners.

Adopting this memorandum as its findings of fact and conclusions of law pursuant to General Admiralty Rule 46½, 28 U.S.C.A., proctors for respondents will prepare and present a decree in accordance with the conclusions reached herein.